We'll hear argument next in Case 18-726, Lamone v. Benisek. Mr. Sullivan. Mr. Chief Justice, and may it please the Court, I'd like quickly to try to reorient the Court to Marilyn's case, and then if I can, address some of the concerns that I heard in the argument that you just had. In this case, the Court should reverse and vacate for three reasons. The First Amendment retaliation test that was adopted, a single test was used here, fails to provide a management standard because it does not give courts and legislators the means to distinguish between excessive political considerations and those that have been deemed constitutionally acceptable. Was this an excessive political consideration? I don't think it was, Your Honor. Whether the Court may like it or not, this is the norm for states where one party receives more than 60 percent of the vote in congressional elections. Those states have a lineup of seats. Well, if that's right, then your defense is not really that we can't tell the difference between excessive and non-excessive, because under any measure, this is excessive, isn't it? I mean, you'd only need 10,000 votes to do the population measure that Baker requires, and instead, mapmakers move 66,000 Republicans out of the district, 24,000 Democrats into the district, flips the composition of the district from 47 percent Republicans and 36 percent Democrats to instead 45 percent Democrats and 34 percent Republicans, effectively ensuring that Republicans will never win this seat again, and that Maryland, which has about 35 percent Republicans, is going to have one Republican House member for the foreseeable future. How is that not excessive? There's a number of things wrong with that, Your Honor, respectfully. One is it starts from the perspective that we take one district and we assume that it's the whole universe. It's like the famous New Yorker cartoon. All you see is New York buildings and not the rest of the country. Maps are formed from piecing together parts of the entire state. This one, the sixth district, was heavily influenced by the decision that had nothing to do with partisan politics, and that was to remove a crossing across the Chesapeake Bay that was instituted. The stated goal was 7-1. For some, it was. But it was a goal Governor and others Governor, the speaker I mean, I don't think you should run away from the obvious. I mean, the crossing the bay thing is not very persuasive, given all the evidence that this was just 7-1. You know, you got Easton grouped in with Carroll County, Talbot County, Wicomico County grouped in with west of Baltimore. That's just, as opposed to just crossing the bay. When everyone's saying we want 7-1, I just don't know in response to Justice Kagan's question, you should run away from the obvious. Well, I don't think it's running away to say that there were a lot of other factors that had to do with this. The change in the first district that resulted from the Bay crossing changed a competitive district that Democrats had actually been able to win to a heavily leaning Republican district that Democrats Sure. To make the others all the other way and to get from 6-2 to 7-1 or from 5-3 or 6-2 to 7-1, you get the sixth and eighth both Democratic. The first is going to be Republican for the foreseeable future, as Justice Kagan says, but it's going to be 7-1. That's the stated goal. That's the goal that's effectuated. Well, to get to that, you have to discount other statements in the record, which you can't do on summary judgment, such as Governor O'Malley's statement that given the population growth in the western part of the central part of the state, Montgomery County primarily had the largest growth, you're going to see the most changes out the I-270 corridor. He also said that. So you'd have to say And the I-270 corridor is a community of interest? It is. That was established in this record. It's from independent sources that have nothing to do with They should have put it in the 8th district, then. What's that? If the idea was to unify the I-270 corridor, they couldn't. I look at the map and it's very simple. Put it in the 8th district. Well, that would be an injury according to Plaintiff's own complaint, because they say packing is an injury that's remediable, and that would be packing the Democrats. That's a heavily Democratic area that had more growth than any of the surrounding areas in the entire state, the most growth right there. And so it had to go somewhere, and north was a reasonable direction for it to go. Then 8th district went north. Suppose, hypothetically, to get away from these facts, that what we had to use the three-part test that you just heard. One, there are 42 bishops before whom they swear that they did this just to help the Democrats. Now, we look at the map they used, and the map, by the way, showed in statewide elections, Governor, the Republicans won. But 42 bishops say they swore, in other words, it's indisputable. Second, that this will, in fact, make a difference of who, how many Republicans there are. And third, that it's absolutely durable, and there we get the greatest statisticians, statisticians in the universe in there, okay? Now, imagine this is a — I've exaggerated enormously. But if that were true, then would you say this Court should intervene? I'm not sure I understand all of that, and we might have an — In other words, if it's absolutely indisputed that there was a clear and absolute intent to do this just so the Democrats could get the district, number two, it is indisputed this will have an effect of giving this district to the Democrats, and number three, it's a big effect, and number three, it will happen for the next 20 years, okay? So we've got all three parts, I think, if I understand it correctly. On that assumption, would you say this Court should intervene? I don't know that I can, because, Justice Breyer, you expressed the need to limit it to the extreme circumstance. Well, I just pictured a pretense. If you have that circumstance, then you're going to have to intervene in Arkansas, Kansas, Massachusetts, Oklahoma, Alabama, Kentucky, Tennessee, and Utah, all states where more than 60 percent of the votes are cast for one party. That's in the record at 871 and 1012. It was established and was unrebutted that in states that have a similar political makeup to Maryland, you end up with a congressional delegation that looks very similar to Maryland. So if you're concerned about limiting the Court's intervention to the extreme circumstance, at least under the current state of affairs in these United States, you would not be limiting it to extreme. You would be saying, get ready, Arkansas, Kansas, Massachusetts, Oklahoma, Alabama, Kentucky, Tennessee. Kagan, Well, why should we assume, Mr. Sullivan, that everything would stay the same if the Court said that something was unconstitutional? Don't we usually assume that people change their behavior when the Court sets down a constitutional rule? I mean, the reason why, in this case and in the case just before you, all these politicians are bragging about the amount of partisanship they can put into the maps is because they think it's perfectly legal to do so. If the Court said it's not legal to do so, presumably, some actors would change their behavior, no? Yes, Your Honor, and we certainly would in Maryland, because every time there's a redistricting, before the redistricting, the legislators and the Governor are briefed on all the legal requirements, as happened here, and that would happen in Maryland, I'm sure, and other states as well. What would be an example of a situation where a — the drawing of a district would be impermissible, would constitute impermissible political gerrymandering, in your opinion? Well, we've said in our brief, certainly as indicated in the prior argument, where the minority vote-getters dictate the results for the majority, that would be a situation where certainly the Court ought to be able to remedy that. How does the majority — minority get to do that? I mean, they have — this has to start with a legislature, both houses, being controlled by the same party. I don't understand how a minority could force its will. Well, if — in Maryland, there's history for this. If the people are upset with the way the redistricting happens, they can take it to referendum. And in 1962, a Democratic Governor, legislature, both houses controlled by the Democrats, adopted a redistricting plan, and it was taken to referendum, and the people of Maryland rejected it at referendum. And that's in our record. And then what happened? Then a new map was drawn. Presumably, the people were happy with that. Here, in this case, this map was also taken to referendum, and the people overwhelmingly approved it. And the ballot is now 1.5 million voters, including in counties where Republicans outnumber Democrats. It has been suggested from reading what was on the ballot that most citizens wouldn't understand at all what they were voting for. Three things, Your Honor. First, that wasn't litigated in this case. It was not even mentioned by the plaintiffs in their complaint or in their motion for summary judgment. It was litigated in a court of competent jurisdiction in Maryland State Court, and our intermediate appellate court determined that the language was sufficient, especially when read in light of the individual notices that each voter received before the election explaining the referendum question. And in the Washington State case, this Court said that such notices eliminate any threat of voter confusion.  You think most — you're going to dispute Justice Ginsburg and say most voters knew what they were voting for there? I'm going to agree with our intermediate appellate court, which had a more full record before it than Justice Ginsburg does. But also this Court has not presumed that voters don't understand. In the Anderson case, on which plaintiffs rely, the Court said that people — the Court's going to presume that people are informed, that they read the paper. And here, you'll find at page 70 of Joint Appendix, unrebutted testimony, that the Washington Post ran three lead editorials, urging the people of Maryland to reject this plan. So it was not a secret ballot. It was simply a big issue in the State, and the people overwhelmingly approved it, and we've heard it. Breyer, what I read there is the exact words of the thing they voted for or against. This referendum petition, quote, establishes the boundaries for the State's eight United States congressional districts based on recent census figures as required by the United States Constitution, end quote. Right. All right? Now, is that sufficient? If that were the only thing the voters knew, but this Court presumes that they read the paper, they watch TV, they talk to each other, they have forums as were held here, they receive a notice. If that were the only thing, if I thought that at least a large number of them, that this was the only thing they knew, which is what you just mentioned, then is it sufficient? Now, it's not sufficient for this Court to conclude that there was a problem, because its precedent says you have to have proof that there was actual confusion, and we have no proof in this case because it was not litigated at all. Sotomayor, am I understanding you to be saying that partisan gerrymandering is always non-justiciable? No. No, Your Honor. Not at all. And as I started to outline what is at stake in this case, it's just the specific test that our Court applied at point of surrogacy. So that you've heard the argument in the Rucho case, are you saying that those tests are better, just this one's not? I'm not quite sure what your position is. They may be, but in our case, we've only had a chance to litigate and have an experience with the one test that our Court used, so we don't really have that benefit of being able to tell you with the informed level of analysis that counsel did in the prior argument. Well, but, you know, you've had time to, and I'm assuming you would have, are you okay with any of the Rucho tests? I'm not going to take position, Your Honor. It's not in our case, and typically what the Court has said in Vieth, it's the plaintiff's obligation to come up with the standard. The plaintiff came up with the standard that they wanted to use in our case, and it was used by the district court, and just we're here to argue that that standard is not manageable. You start your brief by saying that you agree partisan gerrymandering poses a threat to democracy. Yes. This Court has said that. What should we – what should the test be, then? Well, again, I can't speak beyond what's in our record. I believe there are tests that can be adopted, and this Court can come up with them. Well, is it your position that this – what was done in Maryland would be okay under any test, but you're not going to tell us which of the possible tests is the right test? Are you just saying the wrong test was done – was used here, so we should send it back to – for the Court to find some other test which you're not going to identify and then apply that to the facts of your case? Well, it would be for plaintiff to identify it if you keep with the analysis in Vieth. But this Court in Davis v. Manamer held that an equal protection standard is justiciable, and that was reaffirmed by a majority of the justices who spoke in Vieth and reiterated in the Arizona State Legislature case. And in this very case, we wouldn't still be here if the Court hadn't found in the first go-around that some form of First Amendment standard is not foreclosed by this Court's precedent. Otherwise, the Court would have had to have formed dismissal. I'll ask you the question that I asked Mr. Clement, which is why can't the Constitution be interpreted to require something close to proportional representation in your view? Well, in my personal view, it could be. But I don't think you need to get that far to say that you could use proportionality. It could be? You're saying the Constitution could be interpreted to require something close to proportional representation? Just as the – Then you would lose, wouldn't you? No, if proportionality is interpreted in light of the reality that, as both experts testified in this case, or have written at least, when one party gets a supermajority of votes, they tend to get a higher percentage of seats than they would get from the straight vote count. And as Dr. McDonnell, plaintiff's expert, has written, if there is any correspondence between those two, it's merely accidental, because typically it's going to be higher in the high-seat count. So the Court has acknowledged that this can be justiciable, and I think the Court can, but come up with a standard. It's – I'd like to have you discuss the First Amendment argument a little bit. I mean, it does seem that this is a situation where the State is taking retaliatory action against Republicans who were in that district and had a more effective vote, and penalizing them for exercising their right to vote by moving them out to a different district. What's wrong with that argument? Well, as we've explained in our brief, retaliation, that whole analysis, has never been used in the legislative realm. And to say that legislation results because the party that had the more votes was retaliating against the other party's views is a position that's been repeatedly rejected in the cases we've cited since the O'Brien case from this Court. Well, you say we haven't done it in the past, but we're being asked to do a lot of it in the past, and it's because there's been a change in how redistricting has been done. And I guess I don't understand. I mean, if you have, I don't know, any other kind of State employee, and you don't like her exercise of First Amendment rights, and you fire her, there's a pretty well-established analysis for approaching that case, and I don't know why the same wouldn't apply here. Well, in the employment context, you can't really – unless it's a policymaking employee, you can't take into account the employee's political views pretty much at all. But in legislating, political views have to be taken into account. People have to speak and have to express their political views in – whenever there's a legislature enacting it, or when the people of the State enacted it, as happened here. So you're in two different contexts, one where speech is prohibited to be a basis for action in the employment context, and legislation where speech is inherent and necessary in order to reach the result. Roberts Well, does speech against other legislators or against voters? I mean, are – you think it's all right to retaliate against the Republicans from the district that were moved out because of how they voted? I don't think that's a fair characterization of what legislators do. And here, it's a question about who are you retaliating against. Washington County, before the redistricting, voted for the Republican, Mr. Bartlett, overwhelmingly. The first election held after redistricting, the same county, totally intact, presumably the same voters that had voted in 2010, voted for the Democratic candidate. So drawing those kind of distinctions in Maryland is very difficult. The evidence in the record of cross-the-aisle voting was very strong. Are you suggesting that the redistricting here was not successful? Well, if you say the intent was a partisan intent, it was successful, except you still have a district that's capable of voting Republican. The 6th District voted overwhelmingly for our Republican Governor, Larry Hogan. So it's not a district that's locked in for Democrats. I mean, I don't approve that. I'm not saying that would be a good defense, but what you can't do is, if a party uses a map for its district, which is a statewide map, you used a statewide map, the Republicans won two statewide elections per government, and so even a party with 60 percent of the votes cannot intentionally — I have to prove it — you know, intentionally draw these maps just so they increase their majority beyond two-thirds of the seats. I mean, I picked those numbers out. You can use other numbers if you want, but you get the idea. The idea is looking into the minds of the legislators, which is difficult, not impossible, and then applying it to extreme situations, and I just used numbers like two-thirds and so forth, and majorities, in order to show it's not impossible to generate analogous numbers from the Constitution. Your Honor, the problem with using the intent as your guide, as here, intent was the dominant factor that the Court relied on, is because in Davis v. Vandemur, the Court pointed out how easy it is to show partisan intent because that's the air that politicians breathe. It's how they get where they are. And in Vieth, a majority of the justices agreed that some partisan effort to affect the vote through the redistricting is going to be present in every redistricting. But when the legislature and the government, the legislative leaders and the governors say, we want seven to one, we want to shrink Republican representation by one, mapmakers achieved that for us. I mean, is there any genuine doubt that that was the aim from the beginning, to shrink Republican districts by one? I think there is doubt. I think if you read the entire record, including what Governor O'Malley said elsewhere in places not quoted by plaintiffs or the district court, where he said that what he wanted was for the Constitution, the statutes, and all case law to be complied with, and after all of that, he would hope that a Democrat would be elected in that district. Breyer. So you may be able to prove it. I'm just saying what you'd have to prove. But it's not the case, in my mind, that every politician considers politics and so forth up in the air. Of course, you're right, they do. But there's a classical reason that they should, and the classical reason is to produce stability in a legislature so that small shifts of voting behavior don't make big shifts in legislatures. But there's no, if that's the reason, that doesn't apply in the case where one party already controls 60 percent of the seats. Well, we do have a fair amount of stability in Maryland. Yes, I know. That's a problem. I'm not saying it's a solution. You have the stability. So your response was, well, politicians will consider politics. Yeah, of course. But our problem is to say when that's too much, and why isn't it too much? Well, I think in other areas of your First Amendment law that plaintiffs have cited for you, for example, Crawford v. Marion County Board of Elections, didn't really care very much, the Court didn't, about the intent. It's let's look at the burdens that are alleged, identify them, measure them, how much of a burden is on how many people, and then make the call whether the State's justification overcomes that. We didn't have that analysis here. There was no measuring. It's any practical difference, is what the Court said, is sufficient to trigger invalidating a map. And any practical difference is going to happen to voters in every single redistricting. Somebody is going to have a difference because of the line change. Now, you say that partisan gerrymandering is justiciable. Under which provision of the Constitution, First Amendment, the Equal Protection Clause, the Elections Clause, or something else? Well, I will say under the Equal Protection Clause, because that's this Court's precedent. That's the only one. And First Amendment is also your precedent in this very case. Both of them. Or at least law of the case in this particular case. Both of them. What's that? Both of them. Your answer is both of them. Both of them are potentially sources for a standard. And what is the test under the First Amendment? What's your test under the First Amendment? I don't have a specific test to propose. But as I indicated in my answer to Justice Breyer, I think anything the Court can do to get away from an intent-based standard where you have a realm, politics, where political aims are just endemic. Do you think the First Amendment and the Equal Protection dictate the same standard or different standards? I would imagine they would have to be different in some – because you have completely different bodies of case law that the Court has developed in those two. So I would imagine there would have to be some difference between the two. Okay. And what's the test under the – you can't tell me what the test is under the First Amendment. What is the test under the Equal Protection Clause? It's intent affects and – intent and affects. What degree of intent? Well, I tried listening to the prior argument, but I lost count of the tally of what – where it came out. But in racial gerrymandering, it's a – it has to be preponderance. But if you're back before the district court, what are you going to tell the district court? We should win, but are you going to try to explain to the district court why you should win? Well, first of all, the other arguments – one of the other arguments we make is how – given the plaintiff's delay, which this Court found last time, puts us in a category of cases that we've cited where courts have determined that where there is delay and you're this close to the census, it's not equitable. It's no longer in the public interest to redraw the map, because the same kind of disruption that plaintiffs complain about, you redraw all the lines, you change all our associational interests, you affect our representation. That's going to happen with redrawing the map, and then you're going to have to redraw the map again in – within a two-year span. So we would – But you think there's going to be a different map drawn after the 2020 census? There will be a different map. Our laws require it. I would like to reserve whatever time I have left. Thank you, Your Honor. Thank you, counsel. Mr. Kimberly. Thank you, Mr. Chief Justice, and may it please the Court. I'd like to begin with just a very succinct statement of what our claim is and what our theory is. When State officials use redistricting to burden a particular group of voters because of their political views with the express goal of making it harder for those – for that group of voters to win elections, and when that goal is achieved so that group of voters is ordinarily doomed to usual electoral defeat under the map, and when the State cannot come forward with a legitimate governmental interest to justify the burdens imposed, the map has to be neutrally redrawn. That in a nutshell is our claim. And all of the evidence in our case proves that the 2011 redistricting in Maryland violated that theory. It's a test that would be met in every particular, except for the one about durability that you mentioned. In every redistricting, partisanship is going to play a significant role, and because you can always do it to one degree or another, it is always going to have an effect. It seems to me that your focus is entirely on durability. Well, I do think all that the Court needs to say in this case is that dooming the targeted voters to electoral failure is enough to state a claim. I think what's helpful, Your Honor, is that coupling that burden with intent makes sense, because that is the intent that all map drawers who set out to gerrymander harbor. Gerrymanderers don't set out to fiddle at the margins. They set out to fix electoral outcomes, and that is exactly what the evidence in this case shows. They don't set out to make it slightly easier for their candidates to win or slightly more difficult for their opponents to win. They set out to change the electoral outcomes. And using metrics like the Democratic Performance Index in this case and the partisan voter index under the Cook Political Report, all of the evidence is that as of the time that the map was enacted, the map drawers understood that this previously safe Republican district would become a safe Democratic district. How do you see your test? I mean, you've introduced the Gingell factors, which the district court didn't rely on here. You say implicitly it did, but it really doesn't anywhere mention Gingell's. How does your test differ from the Rucho test, from either the Women League or the Common Cause? Well, I actually don't see a whole lot of daylight between our test and the tests that are presented in those cases. Except that your test doesn't look at durability at all. Well, it doesn't look at durability as such. But the focus last term was on the difference between vote dilution that would make a practical difference versus vote dilution that would result in a de minimis impact. And I think what would be more helpful to focus on, rather than what counts as de minimis, is to focus on what counts as a practical burden. And we think the great range of cases in which practical burdens that would be actionable arise, it's going to be the situation that I was just explaining to the Chief Justice, that it's where the map drawers set out to doom the targeted voters, because of their politics, to usual electoral failure under the map as drawn. That is, I think, in essence, the range of cases in which a practical difference will be made, and I think it overlaps substantively with the League of Women Voters' approach towards durability. If your claim is based on the First Amendment, doesn't that necessarily mean that partisanship cannot be taken into account at all, not one iota? No, I don't think so, Your Honor. Well, why is that not so? Have we ever said that there's such a thing as benign viewpoint discrimination under the First Amendment? You know, you can discriminate on the basis of viewpoint, but it just has to be small. I think most of this work is done at the justification stage, and this might mirror something like Anderson verdict balancing. It doesn't have to, but our view is as long as consideration of the way that people have voted in the past and intent to make it more difficult for those voters to achieve electoral success is in service of a legitimate government interest, then it would be permissible. So what would be a potentially legitimate government interest? I think it would be pursuit of balanced maps. As the Court said in Gaffney v. Cummings, I think it would be pursuit of competitive districts. I think there are a range of circumstances. What does a balanced map, what does that mean? Well, I think balanced map in the Gaffney sense, which is the sense that I mean, is a proportional map. So in this case, it might be a 6-2 delegation or a 5-3 delegation. But if you set out to draw 5-3 here, say we want to be proportional, we want to be fair, so we're going to have five Democratic districts and three Republican districts. The Democrats, individual Democrats that you sort into the Republican districts are going to be able to say, we're being deprived of our ability to be treated without reference to our partisan affiliation, our political affiliation, right? Well, yes, and I think that's how the... So doesn't that show that your test, but you said doing a 5-3 would be okay. No, no, that's right. So they would... Despite the fact it would still treat individual voters, it would penalize them because of their political affiliation. But, Your Honor, that is exactly the approach this Court takes in its ballot access cases. As long as, so in the hypothetical that you've described, I think Democratic voters may well have stated a prima facie case under the first two prongs, but under the justification prong, the State comes back and says, although true, maybe they admit it, maybe they don't. But although true, we were considering... That shows, I'm sorry to interrupt, that shows what the driver, I think, of your test though, the overwhelming driver is proportional representation. And I guess I'll ask you the question I've asked others. Do you think the Constitution requires proportional representation or something close to proportional representation? I don't think it does require it, Your Honor, and I do not think it drives it. Why don't you think it requires it? Well, I don't see a textual indication in the Constitution itself. The Equal Protection Clause does not suggest to you something where political groups are treated roughly equally? Your Honor, if that's the way that you're inclined to think about it, I'm sorry. I'm just asking, I'm asking why. I'm asking, everyone seems to be running away from challenging the maps, but running away from proportional representation, even though, as you can tell from the questions, there's a suggestion that really it all comes back to proportional representation in some respects. Your Honor, I guess I'll answer the question this way. One, I think the First Amendment is probably the better approach for explaining why it might favor proportional representation, but of course, there are a range of factors having nothing to do with discrimination against groups of voters on the basis of their political views that might yield a non-proportional map. Do you think the First Amendment might require or even tolerate the regulation of speech, and in this instance, the speech is the votes, for the purpose of providing a proportional representation of viewpoints? So, as I was about to say, I think not. I don't think it requires it. I think — Does it tolerate it? I think, yes. I think that's the inevitable conclusion of Gaffney v. Cummings. So if there is a place in a public park, to get back to the classic example, where it is open to speakers, the city that controls that could say, we want to make sure we have equal speakers on both sides of this question, so we're going to — you know, we're going to balance the speakers, they can do that? Your Honor, I don't think ruling in our favor requires the Court to say that, in the least. What we're saying is — Well, you're saying this is a free speech case, right? And you're saying it's okay to regulate speech for the purpose of providing proportionality in some sense? No, Your Honor. What I'm suggesting is, after this Court's decision in Gaffney v. Cummings, we accept as given that it is a legitimate State interest to pursue proportional representation in redistricting. If you take that as a given, then the sort of claim that Justice Kavanaugh was describing would, in fact, be justified under the third prong. But let me emphasize, our claim is not an ends-oriented claim. It is a process-oriented claim. Our view is, under the facts as we've proven them, we are entitled to a neutrally redrawn map in which the — in which the legislature does not use this kind of data with an intent to burden particular groups of voters because of their political support. You would think it would be — you'd agree that if you had a partisan-free map, which you said is required, that would be the first time in history, right? A neutrally drawn map, you mean? Yes, neutrally drawn, without regard to partisanship at all. I can't say for certain whether, as a matter of fact, it would be the first time in history. I would accept that today the accepted approach does not require neutrality, but I think that's precisely the problem. So just — I think just to finish the point, we don't — our position is not, having proved our claim, we're entitled to a redrawing of the Sixth Congressional District so that it favors Republicans. Our point is that we are entitled to a redrawing of the Sixth Congressional District in a manner that does not select a map that disfavors them because of their political views. It may be — That's — look, there is a classical political science view. It's very easy to draw State districts and imagine populations such as the State's 42 percent — 48 percent Republican, 52 percent Democrat, all right? Now, suddenly, 3 percent change, 2.1 percent change. Now, if there's no politics involved whatsoever, I think you can show that that means 100 percent change in the legislature, depending — now, that cannot be a recipe. That cannot be a recipe for American government. I mean, if you believe it can, fine, but you'd have to show that to me. And therefore, people resist, to a degree, your statement that, well, no consideration. Call it a stability consideration, but it's still the same consideration. So I think many people's problems — and what we're — what I'm searching for, anyway, is for you to say, okay, I see a stability interest there, but how much is too much? And now we've heard from one side that said, here's how you find out. You find out by looking at the intent of the legislature, about what the effect is, and about whether it's durable. Right. Do you want to just say that's it and it's the same argument? That might work. I think it is effectively the same argument, Your Honor. And just to draw a counter-distinction, the vote dilution in degree that took place in the 8th Congressional District was roughly the same as the vote dilution in degree that took place in the 6th Congressional District. The vote dilution in the 6th Congressional District resulted in a map drawn such that Republicans were — in the 6th Congressional District were doomed to usual electoral failure. Not so in the — it's the inverse, it's Democrats in the 8th Congressional District. Not so in the 8th Congressional District. So, yes, I think — I think as a practical matter, this — the distinction that the district court below drew between vote — deliberate vote dilution that makes a practical difference and doesn't is, in effect, the same. And we would be perfectly comfortable with the court saying that the way that we know it's too much is if it results in a durable, partisan gerrymander that will resist changes in politics over the coming decade. That is, of course, exactly what is borne out in the evidence in this case. What do we do about the referendum? The whole of the people had a chance to speak. Now, I understand that there are questions about how good a referendum that was. But would your test require this Court to declare unconstitutional gerrymanders that have been approved by the people through referendum themselves? And could this referendum process be used otherwise, too? I don't think so, Your Honor. In my view, the referendum is a red herring. This could not — if this had been a racial gerrymander and it had been put to popular vote and the popular vote had approved this map as drawn, it would still be a racial gerrymander. I completely accept that answer, right? So in effect, you are asking the Court, no matter how good the referendum might be, no matter how much the people themselves might approve these lines, this Court has to tell them it's unconstitutional. On the facts of this case, yes, I think that's correct. I want to come back to the question of justiciability. What do you see as facts of this case? What makes it so here? Well, for one, it was — the intent that led to the adoption of this map in particular is undisputed. This is not a circumstance where you have a, you know, a menu of maps put to the public vote and the public are being asked to exercise their independent discretion on which map to choose. It isn't the public in the place of the legislature. The legislature has acted. It has done so in an unconstitutional way. That Democrats — Well, that's because of the uniqueness of this. Yes, no, that's right. I'm just saying on the facts of this case. On the facts of this case, whatever the public maps might have been in an open situation were different than what happened here. That's right. That would be a very different case, Your Honor. Well, but just to clarify, and I just want to make sure I understand your position, I'm supposing that the people fully understood the gerrymander that took place and fully understood that there was an alternative, a pure proportional representation and it would be great, right? And they rejected it in favor of gerrymander. Now, you may say that that's outlandish and that that isn't what happened in Maryland, but let's just suppose it is. It would still be incumbent in your view on a court to declare the gerrymander unconstitutional. I want to be clear that I understand the hypothetical. The electorate are being presented with an option. You get proportional representation or you get this map. Which do you choose? Yeah. And a majority of Democrats who do better under this map choose this map.  I think that's unconstitutional. Unconstitutional, and we must say so. Yeah. And I don't think the Court should feel especially troubled about that for exactly the reason that the map itself here I think is unconstitutional. I want to come back to the question of justiciability. Justice Shabila, I think the question here is not just whether there is a potential political solution. That doesn't answer the question whether this Court bears an obligation to enforce the First Amendment in these circumstances. The question here is whether the theory that we have put forward before the Court as applied in these circumstances entirely defies judicial judgment so that it cannot be called a legal question at all. And with respect to my friends on the other side, I just don't think there's any basis for saying that. We have this Court's opinions in its racial gerrymandering cases, in its racial vote dilution cases, in its ballot access cases, its First Amendment retaliation cases, and its political patronage cases. In all of those contexts, this Court finds consistently reliable, justiciable standards for deciding exactly the kinds of burdens that are being imposed here. And if they are manageable in that context, they are manageable in this context. Can I interrupt? Alitoson Does your test apply only to districts that are drawn for a partisan reach to favor one political party over another, or could it apply to retaliation for some other reason? For example, suppose the objection of the mapmakers is not that this district had voted Republican, but it was that the particular person in a district, the representative in that district, was a pain in the rear, and so they wanted to get rid of that person. Would that be prohibited by the First Amendment? Gershengorn Not under the theory that we've put forward. Alitoson Well, how could you square that with your retaliation theory? Gershengorn Well, I want to be clear. Alitoson I vote for this person because this guy is, this is the person that I want. And the mapmakers say, we want this person out of the House, so we're going to draw the map so that person is excluded. They're diluting my, I want to vote for this, for my representative, and they're diluting my vote. They're taking away my opportunity to elect the person that I want. So to begin with, the First Amendment retaliation framework that we've referenced in our briefing is just that. It's a framework. We don't think there's any particular magic in the word retaliation itself. The question presented in this context by the First Amendment is whether the State officials are deliberately burdening particular groups of voters because of the way those voters have expressed themselves. That does not to me sound like the scenario that you're describing, where the concern in the case is the behavior of a particular individual. And I might add, in addition, that drawing an individual out of a district does not prevent that individual from continuing to run as a candidate in that district.  Kagan. Kimberly, I'm wondering how easy it would be for plaintiffs to prevail under your standard in the future. Suppose we accepted your test and we made clear that this kind of behavior was unconstitutional. So you didn't have all these people bragging about how much partisan gerrymandering they were doing, right? What makes your case so easy is that everybody was completely up front about what they were doing, as they were in the North Carolina case as well, because they think it's legal, so let's say what we're doing. But if we say it's not legal and that kind of intent evidence just disappears, because you don't find silver bullets like that very often, then what kind of effects evidence would you need to prove your claim? Now, you have all that intent evidence. Don't worry. This is not affecting your case. But, you know, suppose people act like normal people and they just stop saying all these things, and the next case comes along. What would you need to show intent and effects and causation? Well, I think to show intent, it would be the same sort of evidence that you would need in racial gerrymandering cases. This Court deals with that question all the time. I think that part of the test would be the same. I mean, it would really raise the bar, wouldn't it? It would, Your Honor. I mean, you would have to show really dramatic effects to be able to infer intent, wouldn't you? Yes, I think that's right. So, in fact, this would be the outlier cases. I think, as a matter of fact, Your Honor This is not in every case in the universe, every district in the universe. Not at all, Your Honor. And why would you have to show dramatic evidence of effects before you can infer intent? Well, I think, as a general matter, showing intent when you're talking about specific intent rather than general intent, which is the standard that the district court below applied and we think is the correct standard, I think raises the bar very high. When you don't have direct evidence, such as the admissions that we have on our record here, you've got to show So you think if you have the redistricting controlled by one political party and it has a significant benefit for that particular party, that's not enough to infer an intent to draw the districts with an eye to the partisan effect? Well, I think here, Your Honor, that may or may not be so. I think here, though, the question of intent dovetails with the question of justification. If in any of those If in a circumstance where you have a single party control of the government and you have a badly imbalanced map that might suggest improper intent, as long as the state can come forward with some legitimate justification for the imbalance as it's drawn, and as the Court has said in its racial gerrymandering cases, the sorts of political considerations in map drawing are myriad and malleable, and they involve a delicate balancing of all of these factors, all the state has to come forward with is some explanation for the map as it's drawn and the burdens imposed identified by the plaintiff. So if you had the same, if you had a record here with no intent evidence, to pick up on Justice Kagan's question, and it was 5-3, any chance of prevailing on that? We don't have evidence of intent and it's a 5-3 map. I think that's a very difficult case. How about 6-2? I think that's also very difficult. How about 7-1? I think 7-1, it becomes easier to prove intent. There's no question that the result of the And that's because it deviates from proportional. It deviates from proportional, but I think the question also, as I was saying about the third prong, is whether there are neutral justifications, and they might be things like geography. Here, obviously, Maryland's geography has very That's to justify it, but it would be a problem. The 7-1 is a problem. The 5-3, almost certainly not a problem, which I think has got to be right. Well, I think that's right, but to be clear, that isn't to say that our test tends towards proportionality. I think to play out Justice Kagan's hypothetical, which I think is a good one, there would be no intent and evidence in the future, or at least it would be hidden, be harder to discover. So then it would be a lot on effects, and 5-3, it would be hard to prove, 7-1 is easy to prove. Well, that sounds like something that's balanced, to use your words, which is a word you used, 5-3 would be okay, because it's close to the proportion of Democrats and Republicans in the state. Something that's really extreme, to use Justice Kagan's words, would not be okay, 7-1, because it deviates so far from the proportion of Democrats and Republicans. Right, it's just to say that where there's smoke, you're probably going to find fire, and if you don't see smoke, you're probably not going to. Is another way of putting the test, I know it when I see it? Certainly not, Your Honor. So it sounds like you might be comfortable with Justice Breyer's two-thirds limit. 5-3 is probably okay, 7-1 is not. I mean, that suggests some sort of, you know, rough mathematical threshold. Your Honor, I don't think a mathematical threshold is probably the way to go about it, in large part because every state is different, and, you know, how the geography plays out in every state is different. And what other sorts of justifications there may be, I'm sure, will vary, as I said, the Court has recognized. Well, it just seems, Mr. Kimberley, that what you're saying is that once people stop putting these statements on the record, which they will, that what your test will deliver is a way of going after the worst of the worst, and this happens to be one of them. I think that's right, Your Honor. And if I may also come back to a point that you raised earlier, I think we have to give legislators due credit. If this Court says that this kind of discrimination against groups of voters is unlawful, I have faith, certainly, that most legislators will listen and abide this Court's teachings. And so there is not enough time in between now and the 2020 census to litigate any new cases. And so the next round of litigation that this Court sees after adopting a standard in this case or in North Carolina will be after the 2020 redistricting, and presuming that state legislators abide this Court's teachings, there's every reason to think that the incidence of extreme partisan gerrymandering will be significantly reduced. The only reason we see it as often as we do today, and what is extreme seems less extreme, is only because this Court has not identified a standard to rein in the practice. Can I isolate the role of geography with this question? Suppose you have a crazy line drawing, something similar to what is in Maryland, but it ends up in 5-3 districts. Any problem there? No partisan intent on the record, but the lines are really misshaped, but it's 5-3. Well, it wouldn't be a First Amendment problem. It wouldn't be a problem under our test. And indeed, what the evidence shows is there are a lot of reasons to think you might still see that. Okay. And if it ends up 7-1, I think the way, and I'm just trying to understand your test, if it ends up 7-1, the state's in trouble unless the state could show, actually, this fits with county boundaries, and town boundaries, and city boundaries, and actually the geography makes sense, and we don't want to divide the bay, and all kinds of things like that, right? Yeah. I mean, to be clear, I don't think there are actually any such justifications in this case. Right. I take your point on that. They also made a, so that's helpful on the geography. They made a point, I just wanted to give you a chance to respond, on the 6th district not being durable because Governor Hogan won. Can you respond to that? Yes. It's a difference between what the experts call endemic elections and exogenous elections. What MAPDARs look at is the way that voters vote in congressional elections when they're looking to rig congressional elections. On a number of occasions, there have been suggestions that legislatures are going to act as legislatures, and the framers of the Constitution, having committed the elections clause to legislatures, we have to expect they will act that way. That would be a reason to overturn this Court's ballot access cases. In devising access to ballots and how ballots are comprised, there's no reason to think that those in power wouldn't be expected to use that authority to regulate elections to their own partisan ends, and yet we do not accept that they may. That is the upshot of this Court's ballot access cases. Well, I mean, history is a little bit of perhaps significance there. Gerrymandering has been part of American history from the beginning, as was pointed out in the previous case. I'm not sure. Maybe it has been. I don't know that interference with ballot access is on the same level of the air they breathe, as your friend on the other side put it. Your Honor, that may be true, but since the beginning of the Republic, gerrymandering has been recognized also as a constitutional offense. Indeed, the 1812 editorial coining the term gerrymander called it a constitutional offense. I think everybody has understood that it is a constitutional violation from the beginning. Your best authority is a newspaper editorial? Well, certainly not, Your Honor. The legal tools for this Court and Article III courts generally to address this problem haven't emerged until modern times. The incorporation of the First Amendment to the States happened in the 1940s. This Court's ballot access and political patronage cases were decided in the 60s and 70s. I don't think it's any answer to those cases to say that they're ahistorical. I'm sorry? What does incorporation have to do with congressional districts? Well, congressional districting is an act by State legislatures. If State legislatures are cabined by the First Amendment and how they exercise that authority, the First Amendment has to be a limit on their authority. And that wasn't recognized by this Court until the 1940s. You said gerrymandering has been recognized as unconstitutional. But are you defining if gerrymandering is defined as deviation from what you would otherwise get with proportional? Justice O'Connor and Justice Kennedy have made very clear in various opinions that the Constitution contains no such guarantee. Your Honor, what we take to be partisan gerrymandering is the singling out of groups of voters for disfavored treatment in redistricting, and using redistricting in turn to make it to doom those voters to usual electoral defeat. That is the original understanding of what gerrymandering was in 1812 and in the 18th century before that. And we think that is a clear violation of the First Amendment. I'll just say very briefly, the other explanations that General Sullivan has put before the Court explaining the shape of the Sixth District are all flatly disproved by our alternative map, which is reproduced at JA 787. That map respects all of the political considerations elsewhere throughout the State and does not result in flipping the district to democratic control. Thank you. Roberts. Thank you, counsel. Five minutes, Mr. Sullivan. Thank you. I hope not to take all of that time. I think what we've heard, if nothing else, confirms that the plaintiff's test and the district court's test does not provide the answer the Court is looking for, a test that can tell us when the redistricting has gone too far and isn't questioned. Why not, where you have intent, which in this case, all the leaders say, yes, that's what we want to do, reduce the Republican representation by one. And then they tell the mapmakers to achieve that result. The result is achieved, and as a result of the map, this will continue into the future. Why isn't that? Well, there's a number of things wrong with that. The into the future was not proven at all. The map that was developed, the expert testimony agreed that it was a competitive map. Independent sources said it was a plus-two Democratic. And in 2010, the last election before the redistricting, Democrats across the country won 52 congressional seats in districts that were more Democratic than the 6th District in Maryland. So what these legislators were looking at was not a map that was a lock for a future domination by Democrats in 6th District. It was a very vulnerable map, if you look at the results of the 2010 elections, where Republicans swept a victory in district after district with more Democratic components than the 6th District. But the reason that this test doesn't work, as counsel revealed, is that it abandons what this Court or members of this Court, including Justice Kagan and her deal concurrence, have identified as a central evil of gerrymandering, which is the politicians getting one over on the people and not letting the people's will control what the map is going to be. In this case, the people's will was expressed in a referendum, overwhelmingly favoring the map, and counsel says this Court needs to invalidate that result, which would be directly contrary to what this Court has said it's trying to get at in gerrymandering, which is the polls deciding where their district lines are going to be and not the people deciding who they get to vote for. You mean, if there's a referendum on a map that is — that heavily favors one party, and the campaign — and this is a State in which that party is the majority party, and the campaign in favor of the referendum is approve this map because this will really favor the party that you like and the majority votes for that, that would not be — that would be different from the legislature doing it? Well, in the rhetoric that this Court has used in the gerrymandering area, yes, it would, because it's the people's will being expressed, which is the harm that politicians who gerrymander are subordinating the people's will. That didn't happen here. So when the legislature does it, and the members of which are elected by the people, that's one thing, but when people do it directly, it's a different thing? It is a different thing. Now, I'm not saying that the result can always be constitutional. This Court has held that, for example, the people could not approve a map with unequal population. That's one of this Court's precedents. But where the debate is whose First Amendment rights are going to prevail, these seven plaintiffs, it's not a class action, or the 1.5 million Marylanders who voted to approve this plan, I think that's a much more difficult question that was even attempted for an answer to be provided in this case. There was no attempt by the Court below to consider the referendum or its impact whatsoever. And so this test cannot be the answer to how do we protect the people and their ability to ensure that politicians do not draw the districts to serve the politicians instead of the people. Unless there are any further questions? Thank you, counsel. The case is submitted.